424 So.2d 829 (1982)
Joey SARNO, Francisco Riverol, Russell Leicht, al Palange, Jorge Santana, Evelio Santana, Murray Sarno, Ivan Bordas, Charles Canella, Carlos Del Rio, William Thomas Flingos, Joseph Meyers, Salvador Magluta, and Augusto G. Falcon, Jr., Appellants,
v.
The STATE of Florida, Appellee.
The STATE of Florida, Appellant,
v.
William GILLEY, Appellee.
Nos. 79-2125, 79-2126, 80-12, 80-122, 80-123, 80-136, 80-150, 80-151, 80-315, 80-349, 80-983, 80-984, 80-1007 and 80-229.
District Court of Appeal of Florida, Third District.
November 9, 1982.
Rehearing Denied January 18, 1983.
*831 Oteri & Weinberg and Martin Weinberg; Judith H. Mizner, Boston, Mass., Michael H. Blacker, Melvin S. Black, Robert L. Moore, Greene & Cooper and Sharon L. Wolfe, Miami, Varon & Stahl and H. Dohn Williams, Jr., Hollywood, Mary Louise Dennis, and Donald L. Ferguson, Miami, for appellants, for Case No. 79-2125, etc.
Jim Smith, Atty. Gen., and Paul Mendelson, Joel D. Rosenblatt, and Anthony Musto, Asst. Attys. Gen., for appellee, for Case No. 79-2125, etc.
Jim Smith, Atty. Gen., and Theda R. James, Asst. Atty. Gen., for appellant, for Case No. 80-229.
Bennett H. Brummer, Public Defender, and Robert R. Schrank, Asst. Public Defender, for appellee, for Case No. 80-229.
Before SCHWARTZ, NESBITT and BASKIN, JJ.
NESBITT, Judge.

I. The Sting
These consolidated appeals arose out of a law enforcement operation dubbed the "Sting," apparently in reference to a motion picture of the same name. The tale of the investigation, commencing in the Florida Department of Alcoholic Beverages and Tobacco and culminating with more than a hundred arrests, most of them for various narcotics charges, could easily provide the substance for another Hollywood film.
In August of 1978, Sam Turko, a paid informant of the United States Drug Enforcement Agency, told federal officials that he could arrange a deal for the purchase of a truckload of illegal or untaxed cigarettes. The federal agents referred Turko to Agent Tim Douglas of the Florida Division of Alcoholic Beverages and Tobacco. After consulting with his superiors, Douglas reached an agreement with Turko whereby Turko would be paid $12,000 in exchange for supplying information and introducing state undercover agents into the cigarette negotiations. Turko was fitted with a body "bug" and his telephone conversations were taped, all with his consent.
*832 Turko was able to set up meetings between state beverage agents and one Sam Goldfinger, a neighbor of Turko. Unbeknownst to anyone involved in the state investigation, Goldfinger was working as an undercover F.B.I. operative. In any event, one of the state agents, Tom Ilic, was able to infiltrate, through Goldfinger, to a Ron Braswell, the key to the cigarette deal. Ilic wore body "bugs" in all his meetings with Goldfinger and Braswell. Transcripts of tapes of these meetings formed the basis for the first court-ordered electronic surveillance in the investigation  the installation of a room "bug" in Braswell's business office on September 2, 1978. By this time, the State Attorney's Office was heavily involved in the operation and Ilic was sworn in as a special investigator for that office soon after the Braswell room "bug" was installed.
The investigation to this point was placed in serious jeopardy when, on September 6, 1978, Braswell discovered the transmitter and removed it from its hiding place in an air-conditioning vent. Almost immediately, Braswell was placed under arrest by several state agents, including Martin Dardis, Chief Investigator for the State Attorney's Office. Dardis was able to persuade Braswell to cooperate with the state and Braswell assented to the re-installation of the office "bug." In light of his involvement with narcotics dealers, Braswell's discovery of the first office "bug," instead of putting an end to a cigarette shakedown, eventually proved to be a significant stepping-stone to the breakup of a massive drug ring.
As part of his agreement with the state, Braswell consented to have his two office telephones wiretapped. Pursuant to these "taps," Braswell's telephone conversations were intercepted between September 13 and September 15, 1978. Based on Braswell's consent and information derived from the electronic surveillance, the state sought court authorization for the phone "taps" on September 18, 1978. A Dade circuit judge granted the state's application the same day. Conversations overheard on these telephones formed the predicate for court-authorized wire interceptions of other telephones, as well as for extensions of the authorizing orders. Eventually, the state was able to establish a small network of monitored telephone lines. Each of the appellants was overheard on one or more of the telephone wiretaps.
In the meantime, the state was utilizing Braswell to make and arrange sales of marijuana, quaaludes, and cocaine with a constantly expanding group of narcotics dealers. In return for his services, Braswell was permitted to retain profits from at least some of the sales and to engage in the use of small quantities of cocaine. However, transactions taking place in Braswell's office were observed by the police through the use of a hidden video camera, in addition to the oral and wire surveillance.
The "Sting" operation reached its peak when, at the suggestion of Braswell, the state set up a private airstrip guarded by state agents posing as "crooked cops," in order to facilitate the importation of narcotics into this country and inspire confidence in Braswell among the drug smugglers. Federal authorities were present at the airport in a support capacity, having entered the "Sting" operation in late 1978 pursuant to an agreement between highranking state and United States Justice Department officials. But the federal government later withdrew from active participation in the "Sting."
The "Sting" operation itself was terminated in May, 1979. Employing information gleaned from the electronic surveillance devices, the bogus airstrip deals, and Braswell's personal knowledge, the state returned indictments and informations charging approximately 120 unsuspecting persons with various drug-related offenses.
A number of the "Sting" defendants filed motions to suppress the evidence against them. After a joint evidentiary hearing lasting more than seven court days, and after over eleven hours of legal argument of counsel, the trial court denied these motions. Several of the moving defendants entered pleas of nolo contendere, reserving their right to appeal the denial of their *833 motions to suppress based on the state's stipulations of dispositiveness. Most of the issues on appeal were presented by way of a master brief, while certain of the defendants preserved error in individual appeals. Additionally, the state appealed the dismissal of the case against one of the defendants.

II. The Fruit and the Bugs
Appellants' first argument is based on the "fruit of the poisonous tree" doctrine as set forth in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and its progeny. They claim, for various reasons, that the body "bugs" worn by Sam Turko and Agent Ilic constituted unlawful invasions of privacy and, therefore, the entire "Sting" investigation was tainted fruit of the poisonous tree. However, none of the appellants were overheard on the Turko and Ilic body "bugs," nor was the employment of these devices directed at the appellants. Thus, none of them have standing to complain of the impropriety of these "bugs." United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); State v. Hutchinson, 404 So.2d 361 (Fla. 2d DCA 1981); pet. for review denied, 412 So.2d 466 (Fla. 1982); State v. Albano, 394 So.2d 1026 (Fla. 2d DCA 1981). Only Goldfinger or Braswell could object to these "bugs" and they have not done so. Since the appellants lack standing to challenge violations of Goldfinger's or Braswell's constitutional rights, they cannot complain that evidence seized as a product of these alleged violations is inadmissible as tainted fruit. State v. Ferguson, 411 So.2d 963 (Fla. 3d DCA 1982).
Next, appellants assert the impropriety of the September 2, 1978 room "bug" authorization.[1] The state concedes that several of the appellants have standing to challenge the room "bug" since they were overheard on this device. These appellants argue that the affiant supporting the application for the "bug" wilfully and intentionally omitted a key exculpatory statement from the transcript attached to the application. The appellants claim that this omission was material to the probable cause issue and rendered the order invalid. United States v. Park, 531 F.2d 754 (5th Cir.1976); see Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).
The alleged material omission was a statement by Braswell in regard to a truckload of cigarettes that "[t]he load's not hot." Section 934.07, Florida Statutes (1977), enumerates the offenses which may justify the interception of oral or wire communications. As it pertains to this issue, Section 934.07 would authorize such interceptions only to obtain evidence concerning the theft of cigarettes or dealing in stolen cigarettes. Appellants argue that had Braswell's statement that the cigarettes were not stolen been included in the transcript, there would have been no basis for a finding of probable cause. However, careful perusal of the transcript presented to the magistrate reveals that although the cigarettes may not have been "hot" during the time frame Braswell was referring to, the plan was to steal the cigarettes from the truck once it reached a designated location. With this record support, the trial court's finding that the cigarette deal was to involve stolen cigarettes must be affirmed. State v. Battleman, 374 So.2d 636 (Fla. 3d DCA 1979).
Additionally, both Ilic and Braswell testified that the deal was for stolen cigarettes and Ilic testified that he did not intentionally omit anything from the transcript presented to the magistrate. That the believability *834 of these witnesses was an issue for the trial judge is a statement no longer requiring the multiple citation it is often accorded. The order approving the application for the September 2, 1978 room "bug" was properly entered.

III. The Ides and the Eighteenth of September
The discovery of the room "bug" led to Braswell being taken into custody on September 6, 1978. Braswell was held by the authorities for three hours, during which time they attempted to convince him to turn his back on his friends and cast his lot with the state. As a result of this meeting, Braswell informally agreed to the reinstallation of the room "bug," but it wasn't until September 8, 1978, that he returned to the state investigators and issued a sworn statement encompassing his agreement to cooperate fully in their investigation.
With Braswell's consent, the state wiretapped his two office telephones. Some calls made on these telephones between September 13 and 15, 1978 evidenced criminal activity on the part of several of the appellants.
It is contended that the authorities used coercion in order to persuade Braswell to betray his associates and therefore that the consent for the telephone interceptions was not freely given. The trial court, with the benefit of Braswell's own testimony, see State v. Scott, 385 So.2d 1044 (Fla. 1st DCA 1980), found otherwise. Considering that Braswell had two days in which to decide whether to continue, limit, or terminate his relationship with the state before he consented to the telephone interceptions, we cannot say that the trial court's determination was clearly erroneous. Gerrard v. State, 345 So.2d 849 (Fla. 3d DCA 1977). Since Braswell validly consented to the mid-September interceptions and was working in conjunction with law enforcement officers, evidence from telephone conversations to which he was a party[2] is admissible even without a court order.[3] § 934.03(2)(c), Fla. Stat. (1977); Miller v. State, 411 So.2d 944 (Fla. 4th DCA 1982); Chiarenza v. State, 406 So.2d 66 (Fla. 4th DCA 1981), pet. for review denied, 413 So.2d 875 (Fla. 1982).
The appellants also assert that there was a lack of probable cause for the September 18, 1978 court authorization of the Braswell office phone "taps." The affidavit in support of probable cause basically recited that the conversations overheard on the room "bug" and the consent interceptions of September 13 through 15, as well as a debriefing session with Braswell himself, demonstrated that Braswell's office and office telephones were being used to effectuate transactions in narcotics and stolen goods. Appellants' attack upon this order centers around the unlawfulness of the room "bug," the invalid consent to the mid-September interceptions, and the absence of sufficient facts and detail in the application.
The first two of these arguments have already been disposed of unfavorably to appellants. The third succumbs to a common-sense and realistic reading of the affidavit as a whole. United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Zuppardi v. State, 367 So.2d 601 (Fla. 1979); State v. Birs, 394 So.2d 1054 (Fla. 4th DCA 1981); Amerson v. State, 388 So.2d 1387 (Fla. 1st DCA 1980). The affidavit contained the affiant's testimony that he personally monitored the room "bug" when it transmitted conversations concerning theft, dealing in stolen property, dealing in narcotics or other dangerous drugs, and conspiracies to commit these felonies; that such conversations were between Braswell *835 and unknown other persons; and that the office telephones were used during the course of these conversations. Taking into account the remainder of the affidavit, these allegations were sufficient to constitute probable cause.

IV. Piggybacking and Exhaustion
After the September 18, 1978 authorization, the state sought and received extensions of the Braswell "taps," as well as court-authorizations for interceptions of other telephones. Nine separate locations including a total of thirteen different phone numbers were subject to interception at one time or another. Appellants suggest that the applications for these other authorizations, and extensions thereof, were merely "piggybacked" upon one another, were boilerplate in nature, and did not meet the standards set out in Section 934.09(1)(c), Florida Statutes (1977), concerning the exhaustion of normal investigative techniques.
These issues were dealt with by this court in Cuba v. State, 362 So.2d 29 (Fla. 3d DCA 1978), cert. denied, 378 So.2d 344, 378 So.2d 347 (Fla. 1979).[4] The Cuba case held that including in one affidavit information contained in a prior affidavit does not automatically invalidate an order based on the second affidavit. 362 So.2d at 32. Cuba set out a three-part test for determining the validity of successive orders. First, the facts of the original affidavit must be sufficient to establish the probable cause and necessity for a wiretap. Second, subsequent affidavits must not depend solely on the facts set out in prior ones. Third, succeeding affidavits must be based at least in part on facts and information derived by new and further investigation.
We have already determined that the September 18, 1978 affidavit was sufficient. Therefore, the first prong of the Cuba test is satisfied. Regarding the second and third prongs, each of the subsequent affidavits evidenced that the "Sting" investigation was ongoing and that the monitoring of the subject telephones consistently revealed new conversations involving new illegal transactions and new principals to these transactions. In this setting of an expanding investigation uncovering continually widening segments of a large illegal operation, the Cuba test for valid "piggybacking" was met.
The alleged lack of exhaustion of normal investigative techniques presents a different question. Section 934.09(1)(c), Florida Statutes (1977), requires inclusion in an application of "[a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." As was noted in Cuba, the purpose of this requirement is to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. See also United States v. Kahn, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). On the other hand, it is not necessary to show that all possible means of investigation have been attempted and exhausted before a wiretap order may issue. State v. Birs, supra; Hudson v. State, 368 So.2d 899 (Fla. 3d DCA), cert. denied, 378 So.2d 345 (Fla. 1979); Cuba v. State, supra.
Each affidavit in the instant case contained a list of at least six allegedly non-feasible investigative techniques. Aside from certain specific references to unsuccessful physical surveillance conducted at the homes of some of the suspects, the gist of the exhaustion allegations was that the drug conspiracy was being carried out for the most part over the telephone; that as an informant, Braswell could not identify all of the conspirators; and that the wiretaps were the only way to monitor the transactions and to continue to uncover different and perhaps more powerful participants in the conspiracy. Although such assertions may not justify electronic surveillance in every narcotics case, the affidavits, when read in a practical and common-sense *836 fashion, State v. Birs, supra, indicate the inefficacy of conventional investigative techniques. Consequently, the use of electronic surveillance was warranted. See United States v. Armocida, 515 F.2d 29, 38 (3d Cir.), cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); State v. Carney, 407 So.2d 340 (Fla. 4th DCA 1981).

V. Due Process
The appellants also contend that the police behavior in the "Sting" operation was so outlandish as to require reversal under the supervisory powers of the court and the due process doctrine of fundamental fairness. Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Insofar as it relates to police action directed against parties other than appellants themselves, this argument is precluded by a lack of standing. United States v. Payner, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). As to the remainder of the police activities, we cannot say that they were so shocking as to invoke the extraordinary remedy the appellants seek. United States v. Gray, 626 F.2d 494 (5th Cir.), cert. denied, 449 U.S. 1038, 101 S.Ct. 616, 66 L.Ed.2d 500 (1980), 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 (1981); United States v. Thomas, 567 F.2d 638 (5th Cir.), cert. denied, 439 U.S. 822, 99 S.Ct. 90, 58 L.Ed.2d 114 (1978); United States v. Leja, 563 F.2d 244 (6th Cir.1977), cert. denied, 436 U.S. 948, 98 S.Ct. 2853, 56 L.Ed.2d 790, 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978); United States v. Ratcliffe, 550 F.2d 431 (9th Cir.1977); United States v. Puma, 548 F.2d 508 (5th Cir.1977).
We have carefully considered the other points raised in the appellants' master brief and find them to be without merit. One of the individual appeals and the state's appeal require some discussion.

VI. The Sea Rock
Francisco Riverol appeals the denial of his sworn motion to dismiss a charge of conspiracy to sell, deliver, or possess cocaine. He claims that the only evidence against him was a taped telephone conversation in which he asked another conspirator to leave him a "sea rock," and that this evidence was not sufficient to send the case to a jury. See United States v. Harbin, 601 F.2d 773, 784 (5th Cir.1979). The state's traverse proffered that an Officer Raul Martinez would testify as an expert that in the context of his investigation of the entire matter, the subject conversation involved a cocaine conspiracy. Riverol contends that this traverse was improper because Martinez' opinion would be inadmissible either as an opinion on the ultimate issue or as based on inadmissible evidence of prior criminal activity in violation of the so-called Williams rule. Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).
Concerning the first argument, although the Florida Evidence Code would clearly render ultimate fact opinion admissible, § 90.703, Fla. Stat. (1979), its effective date of July 1, 1979 makes it inapplicable to the present case. § 90.103(2), Fla. Stat. (1979); In re Evidence Code, 376 So.2d 1161 (Fla. 1979). Nonetheless, we need not resort to the Code since the Florida Supreme Court recognized the admissibility of such an opinion long before promulgation of the Code. North v. State, 65 So.2d 77 (Fla. 1952), aff'd per curiam, 346 U.S. 932, 74 S.Ct. 376, 98 L.Ed. 423 (1954).
Regarding Riverol's second argument, we fail to discern the contended-for application of the Williams rule. The Williams rule was designed to prevent similar crimes evidence from reaching the trier of fact when such evidence tended to show only the defendant's bad character or propensity to commit the charged crime. Here, the evidence Officer Martinez would have relied upon was admissible to explain the acts in question; to wit: the meaning of Riverol's request that another conspirator leave him a "sea rock." See Smith v. State, 365 So.2d 704 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979); Jacobson v. State, 375 So.2d 1133 (Fla. 3d DCA 1979), cert. denied, 385 So.2d 758 (Fla. 1980); Horner v. State, 149 So.2d 863 (Fla. 3d DCA 1963), cert. denied, 162 So.2d 904 (Fla. 1964). We note again in *837 passing that were the Florida Evidence Code applicable to this case, Officer Martinez' expert opinion would be admissible regardless of the admissibility of the facts underlying that opinion. § 90.704, Fla. Stat. (1979). The order denying Riverol's sworn motion to dismiss is affirmed.

VII. The Dream
The state has appealed an order dismissing on double jeopardy grounds an information charging William Gilley with conspiracy to possess with intent to distribute a quantity of cannabis and/or methaqualone. The state had filed two separate informations, each alleging that Gilley was to sell his airplane to a group assembled by Braswell for the purpose of flying a load of marijuana and quaaludes from Colombia into this country. One information stated that the airplane was to leave for Colombia on February 10, 1979, and listed six conspirators. At trial pursuant to this information, Gilley obtained a verdict of not guilty and a consequent judgment of acquittal. The other information stated that the airplane was to leave on February 12, 1979 and named five conspirators, only one of which was listed on the first charging document. Of course, Braswell would also have been added to both lists had he not attained his bargained-for status as an "un-informed-against" conspirator. The state claims that due to the different take-off dates and the substitution of some conspirators for others, there would be no double jeopardy violation in trying Gilley pursuant to the second information.
However, it appears from the record that the only reason the airplane did not leave on February 10 was because the pilot's mother had dreamed that something terrible was going to happen to the airplane  a prophecy that dissuaded the pilot from undertaking the trip. It is obvious that despite the substitution of certain other defendants along with a different date, the conspiracy charge as it related to Gilley was the same in each information. At the first trial, there was no dispute as to whether Gilley agreed to sell his airplane to Braswell through another conspirator. The ultimate fact to be decided by the jury was whether he did so knowing it was to be used for an illegal purpose. Having been acquitted on one information by general verdict, trying Gilley on the other information would raise a double jeopardy bar in the classic constitutional collateral estoppel sense. Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The order dismissing the information is affirmed.
The judgments and sentences in the cases of all the appealing defendants are likewise affirmed.
Affirmed.
NOTES
[1] Appellants contend that the room "bug" did not function properly until after Braswell discovered it and consented to its reinstallation. The state claims that the "bug" was operating as early as September 5, 1978, a day before Braswell uncovered it. However, it appears from the record that only Braswell was overheard on the 5th. Therefore, we could approach resolving the admissibility of evidence seized via the room "bug" by examining Braswell's consent to its reinstallation. It must be assumed, though, that Braswell was not a party to all of the intercepted conversations during the long period of time that the "bug" was in operation. Braswell's consent does not resolve the admissibility of the conversations to which he was not a party. § 934.03(2)(c), Fla. Stat. (1977). Accordingly, we proceed to a determination of the propriety of the September 2, 1978, court-authorization of the office "bug."
[2] The trial court suppressed the mid-September consent interceptions to which Braswell was not a party.
[3] Appellants have not contended that any of the Braswell consent interceptions involved telephones located in their homes. Consequently, we need not discuss whether our supreme court's decision in State v. Sarmiento, 397 So.2d 643 (Fla. 1981), is applicable here. Nonetheless, we observe that the Fourth District Court of Appeal has determined that Sarmiento has no application to the situation where the consenting party to a telephone interception is located outside the defendant's home and is acting pursuant to Section 934.03(2)(c). Miller v. State, 411 So.2d 944 (Fla. 4th DCA 1982).
[4] The result in Cuba recently withstood federal habeas corpus attack by one of the Cuba defendants. Llamas-Almaguer v. Wainwright, 666 F.2d 191 (5th Cir.1982).