484 So.2d 1324 (1986)
Warren BROWN, Appellant,
v.
The STATE of Florida, Appellee.
No. 85-221.
District Court of Appeal of Florida, Third District.
March 11, 1986.
*1325 Bennett H. Brummer, Public Defender, and George T. Pallas, Sp. Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen., and Mark J. Berkowitz, Asst. Atty. Gen., for appellee.
Before SCHWARTZ, C.J., and NESBITT and JORGENSON, JJ.
JORGENSON, Judge.
Warren Brown was charged with multiple counts of credit card theft, dealing in stolen property, and petit theft. Pursuant to a negotiated plea agreement, Brown pled nolo contendere to five counts of dealing in stolen property and five counts of credit card theft. Brown expressly reserved the right to appeal the denial of his motion to dismiss which attacked on due process grounds the "sting" operation out of which the charges arose.
On appeal, Brown claims that the trial court erred in denying his motion to dismiss because the conduct of the law enforcement officers involved in the "sting" operation was so outrageous and shocking to the universal sense of justice that due process principles required dismissal of the charges. We disagree and affirm.
In an effort to gather intelligence data on active burglars and decrease the burglary rate in southern Dade County, the Metro Dade Police Department set up a fencing operation, called B & T Distributors [B & T],[1] in a warehouse area located adjacent to a predominantly poor area of Perrine. Prior to B & T's opening for business, the operation was "publicized" in the community. Pairs of undercover officers, posing as "two dudes out on the streets selling property," traveled to various places in the community and approached, or were approached by, various individuals. The officers would tell these individuals that they needed help in selling a stolen gun and that they would give twenty dollars to the individuals if the individuals would sell the gun to the officers' fence. The officers took interested individuals to B & T and accompanied them to the counter as they sold the gun. The individuals were given B & T business cards and told that they would receive a twenty-dollar referral fee each time they brought in a person who sold property to B & T. The police intended that these "referral" persons would "spread the word" that there was a fencing operation paying for stolen property. The police did not arrest any of these original "referral" persons.
"Customers" dealt with B & T by appointment only. (No other known fencing operation used business cards or required an appointment or referral by another person.) *1326 The referral person would usually come to B & T along with the customer to collect the twenty dollars. Certain customers, including Brown, brought in valueless property, such as identification and membership cards, and the undercover officers would tell them that the property was worthless but, nevertheless, would give them ten dollars "for their trouble." The undercover officers working the counter explained to some customers, including Brown, what types of credit cards they wanted, the nature and purpose of credit cards, and that expired cards were of no value (although customers, nonetheless, were paid a nominal sum for these cards). The officers testified that their actions in instructing customers about credit cards and requesting unexpired cards were consistent with a real fencing operation and that, if such explanations had not been given, the entire operation would have been jeopardized.
The operation ran for four months and resulted in the filing of approximately 180 criminal cases. Brown visited B & T on eight occasions. On one occasion, Brown told the officers that he had just obtained the credit cards the day before. The property Brown brought to B & T was traced to five crimes against persons, i.e., one armed robbery, one strong-arm robbery, and three purse snatchings.
As authority for the proposition that the conduct of the law enforcement officers established a viable due process defense, Brown relies principally upon State v. Glosson, 462 So.2d 1082 (Fla. 1985), and Cruz v. State, 465 So.2d 516 (Fla.), cert. denied, ___ U.S. ___, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985).
In Glosson, the Florida supreme court condemned law enforcement use of contingent fee agreements with informants where payment of fees is conditioned upon the informant's cooperation and testimony in the criminal prosecution and the testimony is critical to a successful prosecution. The court rejected "the narrow application of the due process defense found in the federal cases." 462 So.2d at 1085. The court did not, however, provide any general standards or attempt to delineate the contours of the due process defense as it is to be applied in Florida.
In Cruz, the Florida supreme court disapproved the use of a "drunken bum decoy." In so doing, the court adopted a two-prong objective test for entrapment. This test must be satisfied by the state before the question of the defendant's predisposition is addressed. (Brown's predisposition is not an issue before us, and, therefore, we do not discuss subjective entrapment.)
The two-prong objective test requires the state to establish initially whether "police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." Cruz, 465 So.2d at 521 (quoting Sherman v. United States, 356 U.S. 369, 382, 78 S.Ct. 819, 825, 2 L.Ed.2d 848, 856 (1958) (Frankfurter, J., concurring in the result)). The purpose of this test is to determine "whether the police have cast their nets in permissible waters." Id. at 521-22. As guidance for the trial courts, the court propounded the following: "Entrapment has not occurred as a matter of law where police activity (1) has as its end the interruption of a specific ongoing criminal activity; and (2) utilizes means reasonably tailored to apprehend those involved in the ongoing criminal activity." Id. at 522. The court stated that the first prong "addresses the problem of police `virtue testing,' that is, police activity seeking to prosecute crime where no such crime exists but for the police activity engendering the crime." Id.
The second prong of the threshold test addresses the problem of inappropriate law enforcement techniques. In discussing this prong, the court cited with approval section 2.13 of the Model Penal Code (1962), which defines entrapment as law enforcement activity that
induces or encourages another person to engage in conduct constituting such offense by either:

*1327 (a) making knowingly false representations designed to induce the belief that such conduct is not prohibited; or
(b) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.
Brown did not raise the defense of entrapment. At first blush, therefore, it would appear that Cruz is inapplicable. However, we consider the Cruz objective test because (1) at the time of the proceedings below, Brown did not have the benefit of Cruz (entrapment, as that term was formerly understood, did not have an objective aspect); (2) Brown has brought into question the propriety of the government's conduct of the operation, and his choice of labels (i.e., "due process" versus "entrapment") should not be considered significant; and (3) in any event, the objective test parallels a due process analysis. Id. at 520 n. 2.
The prosecution of a defendant may be barred where the government's involvement in the criminal enterprise out of which the charges against the defendant arise "is so extensive that it may be characterized `outrageous.'" United States v. Gianni, 678 F.2d 956, 959 (11th Cir.), cert. denied, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982); see, e.g., United States v. Jannotti, 673 F.2d 578, 607 (3d Cir.), cert. denied, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); United States v. Bagnariol, 665 F.2d 877, 882-83 (9th Cir.1981), cert. denied, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982); People v. Isaacson, 44 N.Y.2d 511, 519-24, 406 N.Y.S.2d 714, 718-21, 378 N.E.2d 78, 82-84 (1978). Characterization of the government's conduct "turns upon the totality of the circumstances with no single factor controlling."[2]United States v. Tobias, 662 F.2d 381, 387 (5th Cir.1981), cert. denied, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982); see, e.g., Gianni, 678 F.2d at 960; State v. Hohensee, 650 S.W.2d 268, 272 (Mo. Ct. App. 1982).
Applying the "totality of the circumstances" standard and the Cruz objective entrapment test to the instant case and keeping in mind the more expansive nature of the due process defense in Florida, we conclude that the conduct of the police was not outrageous and did not otherwise fall below standards to which common feelings respond for the proper use of governmental power. The police did not cast their nets in impermissible waters. B & T was designed to identify and bring to justice individuals who were currently committing crimes (i.e., burglaries and thefts). The police did not manufacture crime which otherwise would not likely have been committed. If B & T had not existed, "customers" would have simply sold elsewhere. The causal relationship between the challenged conduct and the burglaries and thefts for which Brown and the others were arrested is tenuous at best; there were no direct inducements offered. Further, the police did not, through strength of persuasion or inducement, "create a substantial risk that ... an offense [would] be *1328 committed by persons other than those who are ready to commit it." Model Penal Code § 2.13(1)(b) (1974). B & T paid the "going rate" for stolen goods. The referral fees and the small sums that were paid for the worthless cards were too insignificant to have engendered crime. The only likely effect of these payments was to divert "customers" away from B & T's "competitors." The fact that the undercover officers explained to Brown and others which cards were desirable does not, as Brown argues, support the theory that crime was manufactured. A "customer"/thief could hardly know, prior to the commission of the principal crime, whether the victim had expired or unexpired credit cards.
Nothing in this record suggests that the law enforcement authorities provided anything more than a service for the disposition of stolen goods and, in so doing, were able to identify the perpetrators of previously committed crimes. The providing of essential services is not misconduct. United States v. Gray, 626 F.2d 494, 498 (5th Cir.), cert. denied, 449 U.S. 1038, 101 S.Ct. 616, 66 L.Ed.2d 500 (1980), cert. denied, 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820, cert. denied, 450 U.S. 919, 101 S.Ct. 1367, 67 L.Ed.2d 346 (1981). The fencing service provided by B & T was not unique, and "customers" were more than willing to take advantage of the bogus fencing operation. Cf. United States v. Savage, 701 F.2d 867, 869 (11th Cir.1983). This court has rejected a due process attack upon police activity which could be viewed as being much more assertive than the police activity at issue here. See Sarno v. State, 424 So.2d 829 (Fla. 3d DCA 1982), revs. denied, 434 So.2d 886, 887, 888 (1983). The level of police involvement in this case does not rise to that condemned in Hohensee and Isaacson  cases cited with approval in Glosson  nor that denounced in Marrero v. State, 10 F.L.W. 2317 (Fla. 3d DCA Oct. 8, 1985), adhered to on motion for reh'g, 11 F.L.W. 59 (Fla. 3d DCA Dec. 24, 1985). The contingency-fee-for-testimony arrangement condemned in Glosson is not present here. The only fees involved in the case at bar are the twenty-dollar referral fees paid to individuals who had referred others to B & T.
We conclude that there was no due process violation under the fifth amendment to the United States Constitution or the broader theories announced by the Florida supreme court under article I, section 9, of the Constitution of the State of Florida and that the B & T operation passes muster under the newly announced objective entrapment test. The judgment of conviction and sentence entered thereon are accordingly
Affirmed.
NOTES
[1] The term "B & T" stood for "Burglars and Thieves."
[2] In United States v. Brown, 635 F.2d 1207, 1213 (6th Cir.1980), the court listed the following factors as being relevant: (1) "[t]he type of criminal activity under investigation"; (2) "whether the government instigates the criminal activity in question, or whether it infiltrates a preexisting criminal enterprise"; (3) "whether the government directs or controls the activities of the criminal enterprise or whether it merely acquiesces in its criminality"; and (4) "the strength of the connection, or causal relationship, between the challenged government conduct and the commission of the acts for which the defendant stands convicted." The Isaacson court set forth the following list of factors: (1) "whether the police manufactured a crime which otherwise would not likely have occurred, or merely involved themselves in an ongoing criminal activity"; (2) "whether the police themselves engaged in criminal or improper conduct repugnant to a sense of justice"; (3) "whether the defendant's reluctance to commit the crime is overcome by appeals to humanitarian instincts such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness"; and (4) "whether the record reveals simply a desire to obtain a conviction with no reading that the police motive is to prevent further crime or protect the populace." 44 N.Y.2d at 521, 406 N.Y.S.2d at 719, 378 N.E.2d at 83.