**Robert W. BAUCOM, Plaintiff-Appellee,**

v.

**John R. MARTIN, as District Attorney pro tem, Stone Mountain Judicial Circuit, Georgia, Defendant-Appellant.**

**No. 81–7171.**

United States Court of Appeals, Eleventh Circuit.

June 7, 1982.

John R. Martin, Atlanta, Ga., for defendant-appellant.

Robert J. Castellani, Atlanta, Ga., for plaintiff-appellee.

Before GODBOLD, Chief Judge, RONEY and WOOD *, Circuit Judges.

* Honorable Harlington Wood, Jr., U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

HARLINGTON WOOD, Jr., Circuit Judge:

A special agent of the FBI, Robert W. Baucom, brought this suit seeking declaratory and injunctive relief to prevent his threatened state prosecution by defendant, John R. Martin, District Attorney *pro tem*, for the Stone Mountain Judicial Circuit, Georgia. Baucom had participated during the course of an investigation in an alleged bribery attempt of a state prosecutor. The district court granted plaintiff declaratory judgment finding that his acts in the bribery scheme were within his authority as an FBI agent, and that therefore any state conviction of him for those acts would contravene the Supremacy Clause of the Constitution of the United States.[1] The declaratory judgment relief being considered sufficient, the requested injunctive relief was denied. The defendant appeals. We affirm.

## I.

The underlying facts are not in substantial dispute. The FBI, in cooperation with Georgia law enforcement authorities, engaged in an investigation of possible violations of 18 U.S.C. §§ 1961 *et seq.*, commonly known as the RICO statute.[2] In pursuing the investigation into gambling and bribery activities, Randall Peek, the District Attorney for the Stone Mountain Judicial Circuit of Georgia, a known associate of gamblers, became identified as a possible subject. There were allegations that gamblers were being officially protected.

Terry Wayne Bardill, who had recently entered a guilty plea and had been sentenced for unrelated federal charges, voluntarily began cooperating with the FBI as an informant. Bardill was approached by one of the gambling suspects with a scheme to "fix" criminal cases in the state circuit by bribery. Peek had been defeated for reelection. The scheme was to contact persons awaiting trial on state criminal charges and endeavor to arrange the favorable disposition of their cases for substantial sums of money before Peek left office. Bardill also informed the FBI that he had had a conversation with State Representative Joe J. Johnson who informed Bardill that he had previously fixed cases with Peek.

Agent Baucom received authority from his supervisors and the United States Attorney to run an undercover bribe attempt in cooperation with the state to determine if Peek could in fact be bribed. Bardill was acquainted with James Ingram, who was awaiting trial on state charges. Bardill, as part of the investigation, talked to Ingram and offered to provide $2,000.00[3] to fix Ingram's case, the sum Johnson reported would be necessary for that purpose. Ingram reluctantly agreed to the benevolent effort in his behalf not knowing it was part of the undercover investigation. As originally set up by Johnson, according to the evidence, Bardill was not to be present when Peek was to be given the money by Johnson. Although the absence of Bardill as an eyewitness to the transfer of money would weaken any future case against Peek, it was believed that Peek could be shown by circumstantial evidence to have accepted the bribe if Peek actually effected dismissal of the case against Ingram. As it turned out, however, Bardill and Johnson were both present when the meeting occurred with Peek. There was some discus-

---

1. Article VI, cl. 2 provides:

 This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of the State to the Contrary notwithstanding.

2. The RICO statute generally provides in pertinent part that a "racketeering activity" means, among other things, gambling and bribery provided those acts are chargeable under state law and punishable by imprisonment for more than one year. Two or more acts of "racketeering activity" within certain time limits constitute a "pattern of racketeering activity." Engaging in a pattern of racketeering affecting interstate commerce constitutes a felony.

3. The money was to be provided by state authorities.

sion at that meeting about a campaign contribution and $1,000 was given to Peek. Peek, however, turned the tables by having Johnson and Bardill arrested by local authorities for attempted bribery.[4] Those state charges resulted in the revelation of the true nature of the bribery attempt and that Agent Baucom had participated. In the meantime, Martin was appointed district attorney *pro tem* to prosecute the state charges because of the disqualification of Peek.

## II.

The resulting issue is the impact of the Supremacy Clause on state prosecution of a federal agent who purportedly within the scope of his official duties allegedly commits a state crime, an attempted bribery. It is Martin's position that there is no authority for a federal agent to "fix" a state prosecution even if the motive is to enforce federal criminal statutes. That being so, it is argued that Baucom was acting outside the scope of his federal authority and is therefore not immune from state prosecution. The distinction is made between an undercover agent who merely gathers evidence and another undercover agent who commits a state offense in the process.

The government argues that the Supremacy Clause protects the agent if he was acting in the performance of his official duties, and did no more than was reasonable. The issue is not, the government argues, whether the agent had express authority to actually violate a state criminal statute. In any event, it is claimed, the agent's acts in the bribery scheme could not constitute a state criminal violation because criminal intent was lacking. *United States v. Rosner*, 485 F.2d 1213, 1223 (2d Cir. 1973), *cert. denied*, 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974).

As Judge Ward noted, "This case lies at the delicate interface between state and federal law enforcement." In granting summary judgment, rather than injunctive relief, Judge Ward adopted the less intru-

sive means of vindicating the agent's rights. That sensitive understanding is necessary when there is antagonism between the federal and state governments.

No one has cited a case factually similar, yet there is some precedent for guidance.[5] *In re Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890), has long been the foundation for consideration of federal-state conflicts arising from state prosecution of federal officers for alleged state crimes. Neagle, a marshal, had been assigned by the Attorney General of the United States to protect Justice Field of the United States Supreme Court as the Justice went about his circuit duties in California. In carrying out that assignment, the marshal shot and killed a man who assaulted the Justice. California sought to prosecute Neagle, but Neagle was discharged from state custody by a federal writ of habeas corpus. The Attorney General of California argued that the writ was improperly issued as nothing in the Constitution or in any act of Congress conferred authority on marshals to protect federal judges. If that specific legal basis was not essential to justify the marshal's assignment, it was argued, then the government's "position would seem to be alarming in its character, and obliterative of the terminal bounds between federal and state jurisdiction. It would recognize a vast body of officers, and constantly increasing, as owing no allegiance except to the federal courts, and possessed of special privileges and immunities not conferred by any act of Congress." *Id.* at 37, 10 S.Ct. 658.

The Supreme Court answered California's argument by holding that even in the absence of specific legislation, "any duty of the marshal to be derived from the general scope of his duties under the laws of the United States, is 'a law' " within the meaning of the Supremacy Clause. *Id.* at 59, 10 S.Ct. at 666. Although the marshal's particular assignment could not be found to be specifically authorized by statute, it was

---

4. The state's case against Bardill was removed to the federal court on the basis that he was acting in behalf of the government. Johnson was convicted.

5. For a dated but interesting background discussion, *see* Strayhorn, *The Immunity of Federal Officers from State Prosecutions*, 6 N.C.L. Rev. 123 (1927).

considered to be within the general scope of his duties. The Court concluded by holding "that if the prisoner (the marshal) is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if in doing that act he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under the law of the State of California." *Id.* at 75, 10 S.Ct. at 672. From that may be drawn the test for application in this case.

Martin argues, however, that *Neagle* is to be distinguished because the marshal's assignment to protect the Justice was "clearly" within the scope of the marshal's authority. California made the same argument in *Neagle* that Martin makes—that the officer's act was beyond any specific authority. It was not, however, "clearly" within the scope of the marshal's authority until the Supreme Court spoke and found that authority lodged within the "general scope of his duties."

*Neagle* was followed by *Drury v. Lewis*, 200 U.S. 1, 26 S.Ct. 229, 50 L.Ed. 343 (1906), which Martin claims narrowed *Neagle*'s application only to cases of "peculiar urgency" with "extraordinary" reasons and "exceptional facts," or otherwise federal court interference cannot be justified. In *Drury* a United States soldier was charged by the state with murder in an incident in which the soldier was attempting to arrest a nonmilitary person suspected of larceny from a federal arsenal. The Court noted that there was a conflict in the evidence as to whether the person shot was a felon attempting to escape arrest. If he were not, it was held that it could not be claimed the shot was fired in performance of the soldier's duty. The determination of the evidentiary dispute, therefore, was left to the state court, there being no need seen for habeas corpus relief in advance of trial.

There are more recent cases applying *Neagle*. In *In Re McShane's Petition*, 235 F.Supp. 262 (N.D.Miss.1964), after a careful analysis of the law by the district judge, the chief marshal of the United States was granted habeas relief from state charges arising from the alleged unlawful use of tear gas during a disturbance at the University of Mississippi.

In *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973), the court was faced with an extensive and complicated federal scheme designed to bring to light corruption in the New York criminal justice system. Although the particular scheme was sharply criticized *in dicta* as "an arrogant disregard for the sanctity of the state judicial and police processes," that issue was not resolved as the case was reversed on other grounds.

The government relies in part on *Clifton v. Cox*, 549 F.2d 722 (9th Cir. 1977), but Martin disputes the correctness of the decision on the basis that it unjustifiably expands *Neagle* and is weakened because of some disagreement in the majority analysis and a dissent. Clifton, a federal narcotics agent, in the process of executing a search warrant shot and killed a suspect mistakenly believing the suspect had fired at the agents. The court determined that the search warrant was not valid, and that no shot had been fired at the agents. Nevertheless, the court held that the agent's acts were within the scope of his authority and necessary and proper, or at least the agent reasonably believed his actions to be at the time. The grant of habeas corpus discharging the agent from state custody was affirmed.

### III.

Although the federal-state issue customarily arises in a habeas corpus proceeding, 28 U.S.C. §§ 2241 *et seq.*, or in a removal proceeding, 28 U.S.C. § 1442, it is not disputed that it may be resolved by declaratory judgment. *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

As we approach a solution to this case, it is well to heed the general admonition of Judge Friendly in *Archer*:

It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental "inves-

tigation" involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction. Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality.

486 F.2d at 676–77.

We do not face so extreme a case as *Archer*, but disruption of the state judicial process by federal officers, even without an improper motive, can be serious. This case may be distinguished from *Clifton, supra,* in which the agent shot a suspect he mistakenly believed had fired at the agents. That agent acted under the stress of the situation. Baucom, however, participated in a scheme planned in advance, as did the officials in *Archer*, which otherwise would clearly violate state law. Once any degree of illegal state activity is sanctioned as a means of federal law enforcement, unavoidable problems may be anticipated as to where to draw the line in each case.

 It is clear that a federal official does not enjoy absolute state immunity simply because of his office and his purpose. *McShane*, 235 F.Supp. at 273. That a deliberate violation of state law may render federal law enforcement more convenient is insufficient to shield the agent from state prosecution. More is required lest the issue, at least initially, be left to state court resolution.

 *Neagle* requires first that the federal officer be in the performance of an act which he is authorized by federal law to do as part of his duty. Martin argues that there is no authority for a federal agent to bribe a state official. In *Neagle*, it was held that the necessary authority could be derived from the general scope of the officer's duties. The duty of the executive branch to enforce the laws of the United States and to employ agents to assist in that purpose by detecting and prosecuting crimes against the United States, as provided by statute,[6] requires no elaboration. The authority of the agent, who also had the approval of his superiors and the United States Attorney, was adequate to pursue an investigation of possible federal crimes. Even if the officer makes an error in judgment in what the officer conceives to be his legal duty, that alone will not serve to create criminal responsibility in a federal officer. *Clifton*, 549 F.2d at 727. There is no suggestion that Baucom acted because of any personal interest, malice, actual criminal intent, or for any other reason than to do his duty as he saw it. His good faith cannot be seriously questioned. *McShane*, 235 F.Supp. at 274.

The second part of the *Neagle* test is more difficult to apply, whether what the officer did was "no more than what was necessary and proper for him to do." The use of undercover agents is not *per se* unlawful. *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). It is a recognized technique commonly utilized in narcotic cases. Cases are often made by the purchase of narcotics by undercover agents from peddlers. The purchase as well as sale of narcotics may constitute a state violation, but seldom gives rise to state objections.[7] In this case Judge Ward commented that the undercover technique is often used in cases involving official corruption, and that the officer may have been wrong about Peek is of no consequence. The analogy between narcotics and official corruption cases is not a strained one, both are often very difficult to make. A streetwise wary narcotics peddler, and particularly his supplier, can be vexing targets for narcotic prosecutions. Then there may be the wary public official, educated, possibly an attorney, who may only very carefully

---

6. 28 U.S.C. § 533(1) provides generally for the appointment by the Attorney General of FBI agents to "detect and prosecute crimes against the United States."

7. It may be argued that narcotic purchases are specifically authorized by statute, 21 U.S.C. § 886(b), for moneys are appropriated for purchases, but the statute gives no explicit authority to purchase narcotics in states where purchase may be illegal.

risk his reputation and his office out of avarice. Like the narcotics supplier, he may also deal only through a trusted intermediary. A dishonest public official who profanes his official trust may do more harm to our society than common criminals, and be much more difficult to investigate and convict.

In this case the evidence reveals that the government's scheme, under which acceptance of the bribe was expected to result in dismissal of Ingram's case, would not have been adopted had it been known that Bardill would be permitted to witness the passing of the money to Peek instead of learning of the transaction only through Johnson. If Bardill was not to be a party to the transaction, which the agents had reason to believe was the case, evidentiary problems were anticipated if the scheme's results could not otherwise be demonstrated. In arguing against the use of the scheme, no better alternative has been suggested to fit the circumstances of this case. Had the government's scheme actually resulted in the dismissal of the state charge against Ingram, there is no apparent reason why the charges could not have been reinstated, except if jeopardy had attached or the statute of limitations had run, and neither is claimed.

Investigators and prosecutors must be as aware as are the courts of the "delicate interface between state and federal law enforcement." Deliberate violations of state law for federal purposes must be the rare exception, and be clearly seen to be reasonable, necessary, and proper. Otherwise, federal officers will have to be abandoned by federal courts as the Supremacy Clause will not save them.

*Drury*, 200 U.S. at 6, 26 S.Ct. at 231, states that the federal court ought not to exercise jurisdiction except in cases of "peculiar urgency." Sufficient urgency exists in avoiding state interference with an ongoing federal criminal investigation. *Clifton*, 549 F.2d at 729, *citing McShane*, 235 F.Supp. at 274 n.18.

This bribery episode was after all not a pure federal intrusion into a state matter. The state itself was a partner of the federal government in the investigation in pursuit of common interests of public concern.

The determination made was correct under *Neagle* and its progeny. The Supremacy Clause controls.

AFFIRMED.