## IN RE: PETITION FOR APPOINTMENT OF SPECIAL PROSECUTOR
Case No. not applicable
Eleventh Judicial Circuit, Dade County
April 24, 1984

GERALD T. WETHERINGTON, Chief Judge of the Eleventh Judicial Circuit.

THIS CAUSE came before the undersigned Chief Judge of the Eleventh Judicial Circuit in and for Dade County, Florida on the Petition of the Florida Criminal Defense Attorneys Association and the Dade County Bar Association for the appointment of a Special Prosecutor to

investigate the matters set forth in the Petition and, thereafter, for the Court to take all appropriate acion to insure the integrity of the state judicial process.

## Facts Alleged in the Petition

The facts alleged in the Petition are essentially as follows:

Shortly before August 23, 1983, an unknown agent of a federal law enforcement agency contacted the Office of the State Attorney of the Eleventh Judicial Circuit of Florida for assistance on a federal criminal investigation of unknown scope and origin. The federal agent met with State Attorney, Janet Reno, State Attorney Chief Investigator George R. Havens and unknown other State Attorney legal personnel in the State Attorney's office. The agent requested the permmission of the State Attorney's Office to manufacture a fictitious arrest and to initiate a fictitious court case against a cooperating federal informant.

The legality of this action was discussed by the federal agent with the State Attorney and her staff. The State Attorney and her staff approved of the action because it was being done in furtherance of a criminal investigation.

On August 23, 1983, a Metro-Dade Police Officer prepared a fictitious arrest affidavit charging the federal informant with a felony and two misdemeanors. The federal informant was then booked into the jail under this fictitious arrest affidavit. He posted a cash bond, was given a notice to appear to answer the charges against him on September 13, 1983 and was released. He also was mailed a formal notice of arraignment on August 23, 1983.

Sometime after he bonded out, the federal informant was sent to the law offices of a local attorney. The federal informant told the attorney a false story concerning his arrest and offered to pay the attorney to help him recover some fictitious illegal drugs. The attorney refused to represent or assist the federal informant and reported the matter to the Office of the State Attorney.

When the federal informant's case was called for arraignment on September 13, 1983, the State announced a "no action", which constitutes a voluntary dismissal of the case by the State without the requirement of court approval or court action. The federal informant's cash bond was later released by court order.

## Issues Involved

The Petitioners suggest that the alleged facts may constitute contempt of court and request that an acting state attorney be appointed under Section 27.16, Florida Statutes (1983) to investigate and, if appropriate,

prosecute an indirect criminal contempt proceeding against appropriate parties. Petitioners also refer the Court to Fla. R.Cr. P. 3.840(a)(4), which authorizes the Court to appoint a private attorney to prosecute a criminal contempt proceeding before the Court.

Four issues are raised by Petitioners' request: (1) Does the Court have the power to appoint an acting state attorney under Section 27.16, F.S. to conduct the investigation requested? (2) Does the Court have the power to appoint a private attorney under Fla. R.Cr. P. 3.840(a)(4) to conduct such investigation? (3) Does the Court have the power to protect the integrity of the judicial process by the power of criminal contempt where necessary? (4) Do the facts alleged in the Petition set forth a prima facie case of indirect criminal contempt? These issues will be addressed in the order stated above.

(1)

Appointment of acting state attorney<br>under Section 27.16, Florida Statutes

Section 27.16, Florida Statutes (1983) states as follows:

> "Whenever there shall be a vacancy in the office of the state attorney in any of the judicial circuits of this state, either by nonappointment or otherwise, or if a state attorney shall not be present at any regular or special term of the courts of his circuit or, being present, shall from any cause be unable to perform the duties of his office or shall be disqualified to act in any particular case, the circuit judge of his judicial circuit shall have full power to appoint a prosecuting officer from among the members of the bar, with the consent of the member so appointed, to whom shall be administered an oath to faithfully discharge the duties of state attorney, and who shall have as full and complete authority, and whose acts shall be in all respects as valid as a regularly appointed state attorney. He shall sign all indictments and other documents as "acting state attorney." The power of the appointee shall cease upon the cessation of the inability or disqualification of the state attorney or the completion of the appointee's duties in any particular case."

Under this statute, where the state attorney is present in the circuit and able generally to perform the duties of her office, the circuit court's power of appoinment of an acting state attorney is limited to situations where the state attorney is "disqualified to act in any particular case. . . ." This limitation has generally been interpreted to mean that there must be a pending case before the Court in which the state attorney is

disqualified to act before the above-quoted appointment power can be utilized.

In *State ex. rel. Shevin v. Weinstein*, 353 So.2d 1251, 1253 (Fla. App. 3rd DCA 1978) the Court stated the following:

> "The law is well-settled that a circuit court judge in Florida has the inherent authority, as well as the statutory authority under Section 27.16, Florida Statutes (1975), to appoint an acting state attorney to act as a prosecuting officer for the State of Florida in a particular case or cases pending before the said circuit court judge where inter alia the state attorney for that circuit refuses or shall be unable or disqualified to act. Such an acting state attorney shall discharge the duties imposed by law on the state attorney in that particular case or cases. This authority, however, is confined solely to appointments in cases pending before the circuit court making the appointment, not to actions pending before a federal court."

The pending case limitation on the Circuit Court's power to appoint an acting state attorney where the state attorney is disqualified from acting in a particular case as discussed in *State ex. rel. Shevin v. Weinstein, supra*, is supported by logic as well as authority. To authorize an acting state attorney to institute investigations to determine whether a case or cases should be filed before the Court where the state attorney is present and not generally incapable of performing her duties would constitute a significant encroachment on the discretionary enforcement powers conferred by law on the state attorney. The objection to such encroachment was expressed by the Court of Appeals of Maryland in *Murphy v. Yates*, 276 Md. 475, 348 A.2d 837, 84 A.L.R. 3d 1, 17 (1975) in the following language:

> ". . .The simple fact is that the special prosecutor's power to initiate an investigation and to commence prosecution if a State's Attorney does not act is a clear invasion of the State Attorney's most awesome discretionary power: to determine whether or not to prosecute . . . Moreover in each instance the power is transferred from what has traditionally been an elected official to an appointed official . . ." Id.

Moreover, Section 27.14, Florida Statutes (1983), provides that the Governor has the authority to assign a state attorney from another circuit to discharge the duties of a local state attorney "[i]f any state attorney shall be disqualified to represent the state in any investigation, case, or matter pending in the courts of his circuit. . . . (emphasis added.) The specific reference to the word investigation in Section 27.14 and its ommission in the "particular case" provision governing

the court's power of appointment in Section 27.16 clearly shows a legislative intent to give a more expansive appointment power to the Governor than to the Circuit Court where a state attorney is present but disqualified to act in a particular matter. This is clearly appropriate since the Governor is the Chief Executive Officer of the state and the exercise of the executive function is committed to the executive branch of government by the Florida Constitution. See Article IV, Section 1(a), Florida Constitution (1968).

The above authorities and reasoning compel the conclusion that the Court is not empowered under Section 27.16, Florida Statutes to appoint an acting state attorney to conduct the investigation requested in the Petition since the investigation requested is not the subject matter of or ancillary to a pending case before the Court, and the Court so holds.

(2)

### Appointment of Private Attorney Under Rule 3.840, Florida Rules of Criminal Procedure

Rule 3.840, Fla. R. Cr. P. provides the procedures to be followed by the court in the exercise of its inherent power to punish acts of indirect criminal contempt. Subsection (a)(4) of this rule states that "[t]he judge may conduct a hearing [on an order to show cause why a defendant should not be held in contempt of court] without assistance of counsel or may be assisted by the prosecuting attorney or by an attorney appointed for that purpose. . . ."

Based on the clear meaning of this language in subsection (a)(4) of Rule 3.840 Fla. R. Cr. P., the court holds that it has the power to appoint a private attorney to investigate and prosecute an order to show cause issued under Rule 3.840 Fla. R. Cr. P. in connection with the matters alleged in the Petition, should such order to show caused be issued.

(3)

### Judicial Power to Punish by Criminal Contempt Proceedings Acts Constituting Obstruction of Justice

The court's inherent power to punish acts constituting obstruction of justice is well established. As stated in *Thompson v. State*, 398 So.2d 514, 517 (Fla. App. 2nd DCA, 1981): "An act which is calculated to embarrass, hinder, or obstruct a court in the administration of justice, or which is calculated to lessen its authority or dignity constitutes a contempt . . . Intent is an essential element of contempt. . . . (Court's

emphasis) The power to punish for contempt is extraordinary and should be used cautiously and is allowed to vindicate the authority and dignity of the judicial office. It should have reference to the nature and enormity of the act complained of. *Martin v. State*, 397 So.2d 1012 (Fla. App. 1st DCA, 1981).

The court therefore holds that it has the power to punish by contempt proceedings any acts calculated to obstruct justice, in accordance with the principles stated in the foregoing authorities.

(4)

Whether the Facts Alleged in the
Petition State a Prima Facie Case
of Indirect Criminal Contempt

Unlike the situation which exists where private parties are alleged to have acted in contempt of court, the Petition herein raises questions of federalism and separation of powers between the judicial and executive branches of government.

The Petition alleges that the undercover investigation complained of was done with the approval of and in conjunction with state law enforcement authorities. Cooperative state and federal undercover investigations, if properly conducted, have been sanctioned by the courts as not violating principles of federalism. In *Baucom v. Martin*, 677 F.2d 1346 (11th Cir. 1982) which involved a state-federal undercover investigation the court observed that "[t]his bribery episode was after all not a pure federal intrusion into a state matter. The state itself was a partner of the federal government in the investigation in pursuit of common interests of public concern." 677 F.2d 1351.

The principal issue, therefor, is whether members of the executive branch of government can be said to have acted in contempt of court based on the facts alleged in the Petition. The answer to this question necessarily requires a discussion of the functions of government to be performed by the executive and judicial branches of government.

As Chief Justice Marshall said in *Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803), "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. . . ." In performing this function of deciding cases and controversies brought before it for legal determination, the court has, under the reasoning of *Marbury v. Madison*, the inherent power to do all things necessary to the performance of its function, including the power of contempt.

Contrasted with the judicial function, the duty of the executive branch of government is to enforce the laws and to employ agents to assist in that purpose by detecting crimes against the state. *In re Neagle*, 135 U.S. 1, 10 S.Ct. 658 (1890).

The duty of the agencies involved to enforce the laws and to employ agents to assist in that purpose by detecting and prosecuting crimes against the state requires no elaboration. See Section 27.255(2) Florida Statutes; Section 943.04, Florida Statutes; 28 USC 533 (1); ABA Standards for Criminal Justice 3-3.1. The State Attorney is the investigatory and accusatory arm of our judicial system of government subject only to the limitations imposed by the constitution, the common law, and the statutes, to protect against possible abuses of the far reaching powers so confided. *Imparato v. Spicola*, 238 So.2d 503 (Fla. 2nd DCA, 1970).

Broad discretion is vested in law enforcement officials in the exercise of their duty to enforce the laws. This discretion is recognized in decisions such as *Berry v. State*, 400 So.2d 80 (Fla. 4th DCA, 1981) holding that a state attorney has immunity for acts committed within the scope of her discretion and in statutes such as Section 839.25, Florida Statutes which provides, in part, as follows:

"839.25 Official Misconduct

(1) "Official misconduct" means the commission of one of the following acts by a public servant, with corrupt intent to obtain a benefit for himself or another or to cause unlawful harm to another.

(a) Knowingly refraining, or causing another to refrain, from performing a duty imposed upon him by law; or

(b) Knowingly falsifying, or causing another to falsify, any official record or official document.

(2) "Corrupt" means done with knowledge that the act is wrongful and with improper motives"

There is no suggestion in the Petition that any of the officials involved were acting to obtain personal benefit.

The law has recognized that the nature of undercover investigatons involves a great deal of discretion. Standard 14.3 of The ABA Standards for Criminal Justice suggests that police discretion, particularly in the area of investigative techniques, can "best be structured and controlled through the process of administrative rule making by police agencies." See also, "Entrapment Through Unsuspecting Middlemen," 95 Harvard Law Rev. 1122 (1982). In an article, appearing at 53 Tex. L. Rev. 203 (1975), Professor George Dix discusses undercover investigations and

police rule making. There, it is suggested that police rule making is merely a device to effect discretionary decision making and therefore should aim at an optimum balance of competing demands. Both the legislature and the courts have traditionally exhibited reluctance to formulate specific guidelines for police use in undercover investigations because they lack an understanding of the practical problems necessary to provide realistic guidelines. Professor Dix also suggests guidelines that should be considered in conducting undercover investigations. 53 Tex. L. Rev. 286.

These authorities illustrate that there are many variables to be considered by law enforcement agencies in the exercise of their discretionary function of enforcing the laws.

Where law enforcement activities impact on the judicial system, however, there is a delicate interface and possible conflict between the executive and judicial functions. Such was present in the principal case relied on by Petitioners in support of their Petition, *United States v. Archer*, 486 F.2d 670, 677 (2nd Cir. 1973). Since the subject matter of Archer came before the courts on three separate occasions, these cases will be discussed as Archer 1, Archer 2 and Archer 3.

(a)

Archer 1

Archer involved an investigation by the Bureau of Narcotics and Dangerous Drugs and the U.S. Attorney's Office of alleged corruption in New York State's criminal justice system. Evidence was sought of a violation of the "Travel Act" which prohibits use of any facility in interstate commerce with intent to promote illegal activity. The plan called for an undercover investigator to pose as a resident alien and underworld character. He was then to be arrested by a New York police officer on phony charges of unauthorized pistol possession, a felony under New York Law. After his arrest, the investigator was to make it known that he would pay a considerable sum to avoid trial or conviction on the charge. Pursuant to this scheme, the investigator was introduced to a lawyer, who indicated that he could make suitable arrangements. This lawyer then contacted defendant Archer, a Queen's assistant district attorney in charge of the grand jury. The three developed a plan to misrepresent to the grand jury that the investigator had carried the pistol because of his employment and maintained a Nevada gun permit. It was hoped that the grand jury would then decline to indict. The plan was carried out and the perjured testimony was given to the grand jury. When asked, assistant prosecutor Archer responded incorrectly that the investigator's story of a Nevada gun permit had been checked out and

found accurate. A month later the investigation was terminated. The participants were convicted of a violation of the Travel Act and appealed.

On appeal, the 2nd Circuit reversed Archer's conviction for violation of the Travel Act on grounds of insufficient evidence. The decision, however, in dicta, indicates a strong distaste for the Federal Agents involvement in practices which involved an "arrogant disregard of the sanctity of the state judicial and police processes". The opinion emphasized the investigator's participation in perjury before the stand grand jury as well as his deception of the New York Court system.

Professor Dix in his law review article entitled "Undercover Investigations and Police Rulemaking," 53 Tex. L. Rev. 203, 282 (1975), made the following scholarly comments concerning the importance of the Archer decision:

> "Although the Second Circuit reversed the convictions on other grounds, its discussion indicates a strong distaste for the undercover agent's involvement, frustration at the inability to attack this participation easily with available legal doctrines, and a willingness to read existing doctrine broadly to deal with the underlying problem. Speaking for the court, Judge Friendly announced that "our intuition inclines us to the belief" that the government involvement violated due process principles within the meaning of the Russell dicta. But not only did the court's discussion flounder in its effort to explain the involvement's offensiveness, the court also expressly acknowledged that the constitutional principles with which it was dealing would unlikely be any less "unmanageably subjective" than the entrapment cases criticized in Russell. Apparently the investigation's major offensive aspects were its disregard for the integrity of the state judicial processes and the investigator's involvement in offenses other than those under investigation; the opinion emphasized the investigator's participation in perjury before the grand jury and his deception of the New York court system. The particular import of his acts is unclear. Despite the court's indication to the contrary, such action cannot be equated with the hypothetical situation in which investigators "instigate robberies and beatings" merely to gather evidence to convict other members of a gang; no specific damage to identifiable interest can be isolated in the facts of Archer.

> Probably the most correct reading of Archer is that the extensive dicta represented simply an extreme discomfort with the agent's participation in offenses and a willingness to

ignore the thrust of Supreme Court directives if necessary to condemn this activity. Most troublesome is the obvious fact that the legal framework in which the court analyzed the case provided no guidance on what interests should be protected, and, therefore, what characteristics of the participation should be regarded as legally significant. The result is an opinion that evinces judicial distaste for some involvement but aids little in determining how future investigations should—or must, when subject to review by the Second Circuit—be limited."

It is important to note that on REHEARING, the court in Archer muted its criticism of the government's conduct when, for the first time, the factual background surrounding the investigation was made known to the court.

"The case for [the government's assertion that the investigation was proper and necessary] would be stronger if, as the government advises now, there was reason to believe that the local corruption had involved some violation of the Travel Act. . ." 486 F.2d 683, 684.

### (b)

### Archer II

Archer's state conviction was upheld in *People v. Archer*, 417 N.Y.S.2d 507 (1979). In that case, with a far more complete factual background, it was held that the above described conduct of the law enforcement officials did not offend due process.[1] Of course, there might be some circumstances where the conduct of law enforcement agents is so outrageous that due process principles would mandate the use of the court's supervisory powers. *Russell v. United States, supra; Sarno v. State*, 424 So.2d 829, 836 (Fla. 3rd DCA, 1982). In evaluating the conduct of law enforcement agencies in carrying out undercover investigations, the conduct, according to *People v. Archer, supra* at 511, must be viewed in the context of proper law enforcement objectives, i.e. the prevention of crime and the apprehension of violators rather than the encouragement of or participation in sheer lawlessness. The court in *People v. Archer* cited *People v. Isaacson*, 406 N.Y.S.2d 714, 719 in which the court set forth certain factors which should be considered in a state due process analysis of permissible police conduct.

"Illustrative of factors to be considered are: (1) whether the police manufactured a crime which otherwise would not

---

[1]The court noted that the record conclusively establishes that the government's motivation in this affair was to weed out existing corruption and restore the integrity of the criminal justice system.

likely have occurred, or merely involved themselves in an ongoing criminal activity (compare *Greene v. United States*, 9 Cir., 454 F.2d 783, with *United States v. Russell*, 411 U.S. 423, 93 S. Ct. 1637, [36 L. Ed.2d 366], supra); (2) whether the police themselves engaged in criminal or improper conduct repugnant to a sense of justice (see *United States v. Archer*, [2 Cir.,] 486 F.2d 670 supra; cf. *Rochin v. California*, 342 U.S. 165, 72 S. Ct. [96 L. Ed. 183], supra); (3) whether the defendant's reluctance to commit the crime is overcome by appeals to humanitarian instincts such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness (See Schecter, Police Procedure and the Accusatorial Principle, 3 Crim. L. Bull 521, 527); and (4) whether the record reveals simply a desire to obtain a conviction with no reading that the police motive is to prevent further crime or protect the populace. No one of these submitted factors is in itself determinative but each should be viewed in combination with all pertinent aspects and in the context of proper law enforcement objectives— the prevention of crime and the apprehension of violators, rather than the encouragement of and participation is sheer lawlessness. As a bare minimum, there should be a purposeful eschewal of illegality or egregious foul play. A prosecution conceived in or nutured by such conduct, as exemplified in these guidelines, so as to cast aside and mock 'that fundamental fairness essential to the very concept of justice' should be forbidden under traditional due process principles."

### (c)

### Archer III

Archer once again appeared before the second circuit, this time on writ of habeas corpus. *Archer v. Commissioner of Corrections*, 646 F.2d 44 (2nd Cir., 1981). In denying the writ, Judge Friendly joined with the New York court holding that the government's conduct was not so outrageous as to constitute a denial of due process. In reaching this conclusion, the court noted that the questioned police conduct was not inflicted directly on the defendant.

Although Judge Friendly's opinion in Archer I shows disapproval and disturbance with the instrusive undercover police conduct, which criticism was muted on rehearing, it is not the holding of Archer I, Archer II or Archer III that the law enforcement officers participating in the intrusive undercover investigation were guilty of contempt of court or other punishable conduct.

The lesson of the Archer cases, nevertheless, is that unjustified law enforcement intrusion into the judicial process will not be tolerated.

Concerning the role of the federal government in conducting udercover investigations involving the commission of acts by federal agents generally prohibited by state laws, it is now established that such conduct "must be the rare exception and be clearly seen to be reasonable, necessary and proper." *Baucom v. Martin*, 677 F.2d 1346, 1351 (11th Cir. 1982). The Supremacy Clause of the United States Constitution, Article VI, cl.2, has been held to bar state prosecutions of federal officers performing federally authorized acts deemed necessary and proper to the performance of their duties. *In re Neagle*, 135 U.S. 1 (1890).

The foregoing authorities must be applied to the facts in the Petition to determine whether the Petition states a prima facie case of indirect criminal contempt.

It must first be observed that the degree of impact on the judicial system alleged in the Petition is far less than that involved in Archer. The facts alleged in the Petition show that a false affidavit was filed with the Clerk of the Court, the case was set on the court's arraignment calendar, a cash bond was deposited with the clerk and the cash bond was released by court order. The federal informant never appeared before any judge of the Eleventh Judicial Circuit, nor was there any misrepresentation made directly to a judge of the Court. Moreover, other than the perfunctory act of releasing the cash bond, no judicial action was requested or obtained in connection with the fictitious case.

Although the impact alleged is minimal, however, any such impact is impermissible unless it can be "clearly seen to be reasonable, necessary and proper." *Baucom v. Martin*, 677 F.2d 1346, 1351 (11th Cir. 1982). To determine whether this test was met requires a knowledge of facts within the confidential files of the federal and state enforcement agencies conducting the investigation. This is clearly indicated in the court's order on rehearing in Archer I when the court stated:

> "The case for [the government's assertion that the investigation was proper and necessary] would be stronger if, as the government advises now, there was reason to believe that the local corruption had involved some violation of the Travel Act. . . ." 486 F.2d 683, 684.

The reasons that prompted the investigation complained of and any facts pertaining thereto are not stated in the Petition and are exclusively within the confidential knowledge of the federal and state executive branches of government. To compel the executive branches of government to produce this information would involve the judiciary in a direct conflict

with both the state and federal executive branches of government which may raise difficult claims of executive privilege, as well as Supremacy Clause considerations. See *In re Neagle*, 135 U.S. 1 (1890) and *Baucom v. Martin*, 677 F.2d 1346 (11th Cir. 1982). While there clearly are circumstances which will trigger judicial inquiry into confidential executive investigatory files to protect the integrity of judicial processes, the court is not convinced that such circumstances have been shown.

The facts alleged suggest that care was taken to avoid any direct misrepresentation to a judge of the court. This bears on the intent involved and militates against the conclusion that the law enforcement officials were intentionally attempting to undermine the court or show contempt for the court. Moreover, although any intrusion into judicial processes is extremely serious and subject to the severest scrutiny, the facts alleged show only a minimal impact on the court's processes. While even the most minimal impact will not be tolerated, if improper, the degree of impact is a pertinent factor to be considered on the issue of contempt because contempt proceedings necessarily have reference to the nature and enormity of the act complained of. *Martin v. State,* 397 So.2d 1012 (Fla. App. 1st DCA, 1981).

In considering the factor of intent, the parties involved should be considered. The state attorney who exercised her judgment and discretion in approving this undercover investigation is widely respected as a public official of integrity and dedication to public service. Such reputation is entitled to consideration by this Court.

For the above reasons, the Court holds that there is no prima facie showing of indirect criminal contempt. The Court wishes to acknowledge its appreciation to Petitioners for the well prepared Petition and for their concern for the integrity of judicial processes.

Because of this concern, which the Court shares totally, the Court recommends to all law enforcement agencies in Dade County, both federal and state, that, if they have not done so already, they adopt standards governing undercover investigations as suggested by Standard 1-4.3 of the ABA Standards for Criminal Justice and include therein standards precluding any unwarranted intrusion into the judicial processes of Dade County, Florida. As observed by ABA Standard 1-4.3, police discretion can "best be structured and controlled through the process of administrative rule making by police agencies."

It must be kept firmly in mind that the Court stands ready to protect the integrity of its processes and will take all actions necessary and appropriate to do so, should the occasion arise.