# OCC Mortgage Lending Testing Program

Individuals who serve as "testers" in a proposed Office of the Comptroller of the Currency program designed to identify discriminatory lending practices by national banks would not violate any federal criminal laws if, as part of the program, they provide false information to targeted banks

March 8, 1994

MEMORANDUM OPINION FOR THE COMPTROLLER OF THE CURRENCY

Our office has been asked to respond to your request to the Attorney General for the Justice Department's view on whether individuals who serve as "testers" in a proposed Office of the Comptroller of the Currency ("OCC") program designed to identify discriminatory lending practices by national banks would be subject to criminal liability if, as part of the testing program, they provide false information to targeted banks. Based on our understanding of the manner in which the testing program will be conducted,[1] we do not believe that the testers would violate any federal criminal laws. The Criminal Division of the Justice Department has advised us that it agrees with our conclusion.[2]

## I. BACKGROUND

OCC is the primary regulator of national banks. In that role, OCC is responsible for ensuring that national banks comply with federal laws that prohibit racially discriminatory lending practices. Last year, OCC announced that it would undertake a serious effort to ferret out such practices. The proposed testing program is part of those efforts.[3]

Posing as prospective borrowers, the testers will communicate with a targeted bank and inquire about available home mortgage programs. In the course of their discussions with bank personnel, testers may provide false information about their identities, employment, income, and credit history. Testers representing different racial groups will be given similar false background information to provide to the bank. Accordingly, when OCC evaluates the manner in which a targeted bank responds to the testers' inquiries, the false information will serve as the constant factor, while the race of the tester providing the information will be the variable

---

[1] Our knowledge of the program is based on information that we have received from OCC personnel who are working on its design and implementation

[2] Our opinion is limited to federal law. We have not considered whether false statements made by the testers would violate any state laws

[3] Testing is a well-established mechanism for identifying discrimination in the sale and rental of housing. *See Havens Realty Corp. v Coleman*, 455 U.S. 363 (1982). We have been told the use of testers to identify lending discrimination is less developed at this point.

23

factor. In this way, OCC will seek to determine whether the race of the testers influenced the bank's conduct, and thus whether the bank may be in violation of the federal fair lending laws.

The testing program will be restricted to what is known as the "pre-application" phase, which means that the testers will only engage in preliminary discussions with bank personnel about available loan programs. The testers will be instructed not to fill out any loan applications or any other document, even if the bank requests that the testers do so.

The testers will not be OCC employees, but rather, persons hired by organizations with which OCC will contract to administer the testing program. Those organizations will help OCC to design the testing program and to train the testers. OCC will, however, oversee and retain ultimate control of the program.

Notice of the testing program will be provided to other federal agencies that have some regulatory authority over national banks.[4] In addition, we believe that OCC should give notice about the testing program to the United States Attorney in the particular districts in which targeted banks are located; it is our understanding that OCC has no objection to providing such notice.

## II. DISCUSSION

In considering whether the OCC testers would be subject to criminal liability, we have analyzed four federal statutes that, in certain circumstances, reach false statements made to financial institutions. In order of their relevance to the OCC testing program, those statutes are 18 U.S.C. § 1014, which proscribes false statements made with an intent to influence the actions of a financial institution with respect to loans and certain other transactions; 18 U.S.C. § 1344, which proscribes efforts to defraud a financial institution or obtain money from the institution; 18 U.S.C. § 1005, which proscribes the making of false entries in the records of a financial institution with the intent to deceive officers of the institution; and 18 U.S.C. § 1001, the general federal false statements statute, which proscribes false statements made "in any matter within the jurisdiction of any department or agency."

We do not believe that false statements made by OCC testers in the context of pre-application testing would violate any of the four statutes. The critical features of the OCC testing program are that (i) it will be confined to the pre-application stage; (ii) the testers only will be seeking information from targeted banks; (iii) the testers will not fill out application forms or submit any other documents to the banks; and (iv) the testers will have no intention of applying for a loan or obtaining any funds from the banks. In light of these limitations, the testers will lack the req-

---

[4] Those agencies include the Federal Deposit Insurance Corporation, the Board of Governors of the Federal Reserve System, and, at least with respect to lending activities, the Department of Housing and Urban Development and the Department of Justice

uisite intent to violate §§ 1014, 1344, and 1005. As for § 1001, we do not believe that the testers' false statements would come within the scope of that statute, because the statements would not be made in connection with a "matter within the jurisdiction of any department or agency." Furthermore, we do not think that the testers false statements would satisfy the "materiality" requirement that most courts have read into § 1001.

Our opinion is limited to false statements that may be made as part of the OCC pre-application testing program. In our view, persons acting outside the particular context of the OCC testing program who make false statements in connection with pre-application inquiries could violate the statutes in question here, particularly §§ 1014, 1344, and 1005. Simply put, such persons might well have the requisite intent to violate those statutes, whereas the OCC testers will lack that intent.[5]

## A. *Section 1014*

18 U.S.C. § 1014 prohibits persons from making false statements, either written or oral, "for the purpose of influencing in any way the action of [financial institutions] upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan." One of the elements of a § 1014 violation is "intent to influence action by the financial institution *concerning a loan or one of the other transactions listed in the statute.*" *United States v. Erskine*, 588 F.2d 721, 722 (9th Cir. 1978) (Kennedy, Cir. J.) (emphasis added). *See United States v. Krown*, 675 F.2d 46, 51 (2d Cir. 1982); *United States v. Pavlick*, 507 F. Supp. 359, 362 (M.D. Pa. 1980), *aff'd*, 688 F.2d 826 (3d Cir. 1982). Because the OCC testing program will be limited to the pre-application setting in which testers only will be seeking information from targeted banks, and because

---

[5] Because OCC will be directing the testers' conduct, and because notice of the testing program will be provided to other affected agencies, we also believe that the program should be regarded as a valid law enforcement tool designed to uncover violations of the federal fair lending rules. In that sense, the testing program would be analogous to other federal "sting" operations that have been held to be legal, even where the participants in the operations engage in conduct that would be illegal outside the law enforcement context. *See Hampton v. United States*, 425 U S 484, 490 (1976); *id* at 490-91 (Powell, J., concurring); *United States v Russell*, 411 U.S 423, 432 (1973), *Lewis v United States*, 385 U S. 206, 208 (1966), *see also United States v. Mosley*, 965 F.2d 906, 912 (10th Cir. 1992) ("the government can act as both supplier and buyer in sales of illegal goods"); *United States v Milam*, 817 F.2d 1113, 1116 (4th Cir. 1987) (government agents may sell counterfeit currency to uncover scheme to distribute such currency), *Shaw v Winters*, 796 F 2d 1124, 1125-26 (9th Cir 1986) (police department may sell stolen food stamps to uncover fencing operation), *cert. denied*, 481 U.S. 1015 (1987), *United States v. Murphy*, 768 F 2d 1518, 1528-29 (7th Cir. 1985) (government agents may offer bribes to public officials to uncover corruption), *cert. denied*, 475 U.S. 1012 (1986)

We do not express any opinion as to whether, under the principles of *In re Neagle*, 135 U S 1 (1890), the testers' participation in a valid federal law enforcement operation would shield them from state prosecution if their conduct violated state laws *See Baucom v Martin*, 677 F.2d 1346 (11th Cir. 1982) (applying principles of *In re Neagle* and holding that FBI agent was not subject to state prosecution for attempting to bribe state official as part of a federal law enforcement operation designed to uncover corruption in state government) As it relates to the OCC testing program, the issue would be whether the principles of *In re Neagle* apply to persons who are not themselves federal government employees, but who are working at the direction of federal officials.

they will have no intention of actually applying for a loan or entering into any of the other types of transactions specified in the statute, their false statements will not come within the scope of § 1014.

Construing § 1014 broadly, some courts have held that the statute covers any transaction that might subject a financial institution to risk of financial loss.[6] But even under that reading of § 1014, the testers' false statements would not violate the statute: again, because the testing program will be restricted to the pre-application phase, and because the testers will have no intention of either applying for a loan or entering into any of the specified transactions, there is no risk of financial loss to the targeted bank.[7]

## B. *Section 1344*

18 U.S.C. § 1344, the federal bank fraud statute, makes it a crime to "knowingly execute[], or attempt[] to execute, a scheme or artifice to (1) defraud a financial institution or (2) to obtain any of the moneys, funds, credits, assets, securities or other property . . . of a financial institution, by means of false or fraudulent pretenses, representations, or promises." Under either prong of the statute, it is not necessary to show that the "scheme or artifice" actually caused the institution a loss or that the defendant personally benefitted — it is enough that the institution is

---

[6] *See United States v Stoddart*, 574 F 2d 1050, 1053 (10th Cir. 1978); *see also United States v Payne*, 602 F.2d 1215, 1219 (5th Cir 1979), *cert denied*, 445 U S. 903 (1980) Court decisions that look to risk of loss in determining whether a transaction falls within § 1014 do not hold that intent to cause a risk of loss is a necessary element of a § 1014 violation

[7] At OCC s request, we have looked at the definition of application under the Federal Reserve Board's regulation implementing the Equal Credit Opportunity Act, 15 U.S C § 1691 ("ECOA"). Together, ECOA and the Fed's Regulation, known as Regulation B, prohibit banks from discriminating on the basis of race against "applicants" for credit, and require banks to send a notice to persons whose applications are rejected, the notice must set forth the reasons for the bank's decision to deny the applicant's request for credit Regulation B defines "application" as "an oral or written request for an extension of credit that is made in accordance with procedures established by a creditor . . " 12 C F.R. § 202 2(f) (1993). The Fed's Official Staff Interpretation of Regulation B provides that, in the normal course, inquiries of the sort that the OCC testers will make do not constitute an "application." For example, the Official Staff Interpretation states that no application has been made when a consumer asks about the bank's terms for mortgage loans and provides information about her income, and in response, bank personnel explain the institution's lending policies 12 C.F R pt 202, Supp. I, App. D, at 48-49 (1993).

The Official Staff Interpretation does state that an inquiry becomes an application when bank personnel determine that the individual making the inquiry would not qualify for a loan, and that determination is conveyed to the individual on the spot. It is our understanding that this is unlikely to occur in the OCC testing program, given the limited nature of the inquiries that the testers will make. However, it is conceivable that a bank could tell a tester that he does not qualify for a loan, and thereby treat the tester's request for information as an application for purposes of Regulation B. This would not mean, however, that the request would also be an application for purposes of § 1014 The focus of Regulation B is different from that of § 1014 Regulation B is concerned with the conduct of the lender, while § 1014 is concerned with the conduct of the borrower. Accordingly, under Regulation B, whether an inquiry rises to the level of an application depends on how the bank responds to the prospective borrower, not on what the borrower says. Indeed, that is what the Fed's Official Staff Interpretation states. *Id.* at 48. By contrast, under § 1014, it is the statements and intention of the prospective borrower that determine whether an inquiry amounts to an application or other transaction specified in the statute.

exposed to a potential loss.[8] However, there must be an intention on the part of the defendant to cause an actual or potential loss to the institution.[9] The testers will have no such intention, since the purpose of the testing program is merely to obtain information from a targeted bank, rather than obtaining any funds from the bank. As a result, the testers' false statements will not violate § 1344.

## C. *Section 1005*

In pertinent part, 18 U.S.C. § 1005 imposes criminal penalties on "[w]hoever makes any false entry in any book, report, or statement of [a bank] with intent to injure or defraud [the bank] . . . or to deceive any officer [of the bank]." In light of the fact that the testers will only seek pre-application information, and will not fill out any applications or other documents, they will not make any entries in bank records. To be sure, if it is the policy of a targeted bank to record information obtained in pre-application meetings with prospective borrowers, then it is conceivable that the testers' false statements could cause bank personnel to make false entries. In turn, it could be argued that this would lead the testers to violate § 1005, through the "aider and abetter" statute, 18 U.S.C. § 2. In our view, however, even if the testers' statements do prompt the bank to make false entries, the testers would not have any intention of causing that result, and thus they would lack any intention to violate § 1005. *See United States v. Barel*, 939 F.2d 26, 42 (3rd Cir. 1991) (defendant's action in causing bank employees to make false entries did not violate § 1005 because defendant had no intent to cause the bank to violate the statute); *United States v. Rapp*, 871 F.2d 957, 963-64 (11th Cir.) (defendant did not violate § 1005 because there was no evidence that he "knowingly or willfully directed or authorized" the making of false entries by bank personnel), *cert. denied*, 493 U.S. 890 (1989).[10]

## D. *Section 1001*

In pertinent part, 18 U.S.C. § 1001 bars the making of false statements "in any matter within the jurisdiction of any department or agency of the United States." A false statement need not be made directly to a federal department or agency in or-

---

[8] *See, e g., United States v Briggs*, 965 F 2d 10, 12 (5th Cir 1992), *cert. denied*, 506 U.S 1067 (1993); *United States v Solomonson*, 908 F.2d 358, 364 (8th Cir 1990), *United States v Goldblatt*, 813 F.2d 619, 624 (3rd Cir 1987)

[9] *See, e g , United States v Jones*, 10 F 3d 901, 908 (1st Cir. 1993). *United States v Saks*, 964 F 2d 1514, 1518 (5th Cir. 1992); *United States v. Stavroulakis*, 952 F 2d 686, 694 (2d Cir ), *cert denied*, 504 U.S. 926 (1992).

[10] In any event, we have not found any reported decision in which a court has applied § 1005 to persons who were not employees or officers of a bank, agents of a bank, or bank customers acting in conjunction with bank personnel *See Barel*, 939 F 2d at 39 (Section 1005 only applies to bank insiders or their accomplices), *United States v Austin*, 585 F 2d 1271 (5th Cir 1978) (upholding § 1005 conviction of customer who was acting in tandem with bank executives to defraud the institution)

der to come within the purview of § 1001; there are cases upholding convictions under the statute for false statements made to state or local governmental agencies and private companies.[11] In each of those cases, however, there was a clear "nexus" between the entity to which the false statements were made and the function of a federal department or agency.[12] As a general proposition, we do not believe that the necessary link will be present here so as to bring the testers' false statements within the jurisdiction of a federal department or agency for purposes of § 1001.

In a number of the § 1001 cases involving false statements to a nonfederal entity, the required nexus took the form of a funding relationship between that entity and the federal government. In particular, the false statement to the nonfederal entity triggered some statutory obligation of the federal entity to disburse funds.[13] No such obligation is implicated by the testers' false statements to targeted banks. In other cases, false statements to a nonfederal entity were made in connection with a specific statutory or regulatory arrangement between that entity and a federal agency. For example, in *United States v. Wright*, 988 F.2d 1036 (10th Cir. 1993), false statements in a report submitted to a state environmental protection agency were reached by § 1001 where the reports were required to be filed with the state agency pursuant to regulations of the federal Environmental Protection Agency. Similarly, in *United States v. Davis*, 8 F.3d 923 (2d Cir. 1993), false statements made by a federal prisoner to state prison officials were found to be within the ambit of § 1001 where the state officials were acting pursuant to a federal statute authorizing federal prison officials to delegate to state officials the responsibility for housing federal prisoners.[14] Here, however, the testers' false statements will not be tied to a particular program involving the targeted bank and federal agencies. Nor do we believe that the testers false statements will normally end up being submitted to federal agencies pursuant to some statutory or regulatory requirement.[15] That the OCC and other federal agencies exercise general supervisory

---

[11] *See, e.g., United States v. Davis*, 8 F 3d 923 (2d Cir 1993) (false statement to state agency); *United States v. Petullo*, 709 F.2d 1178 (7th Cir. 1983) (false statement to municipal agency); *United States v Brack*, 747 F.2d 1142 (7th Cir 1984) (false statement to private company), *cert denied*, 469 U S 1216 (1985).

[12] *See, e.g., United States v St Michael's Credit Union*, 880 F.2d 579, 591 (1st Cir 1989) (in order for § 1001 to apply to false statements made to a nonfederal agency, there must be a "nexus . between the deception of the nonfederal agency and the function of a federal agency").

[13] *See, e.g., United States v Suggs*, 755 F 2d 1538 (11th Cir. 1985); *United States v. Richmond*, 700 F.2d 1183 (8th Cir. 1983); *United States v Petullo*, 709 F 2d 1178 (7th Cir. 1983). In *United States v Wolf*, 645 F.2d 23 (10th Cir 1981), the defendant made a false statement to a private corporation, which induced the corporation to disburse money to the defendant Because the disbursement was made pursuant to a federal regulatory scheme, the false statements were held to be a matter within the jurisdiction of a federal department or agency for purposes of § 1001.

[14] *See also United States v. Milton*, 8 F 3d 39, 46 (D C. Cir. 1993) (false statements to private company made pursuant to EEOC directive were within the jurisdiction of a federal agency because there was a "statutory basis" for the EEOC directive), *cert denied*, 513 U.S 919 (1994)

[15] The Home Mortgage Disclosure Act ("HMDA") and the relevant implementing regulations require a financial institution to submit to the federal banking agencies certain information regarding "completed applications" to the institution for home mortgage loans *See* 12 U.S C. § 2803, 12 C.F.R. pt 203 (1993)

authority over the banks does not convert the testers' false statements into a "matter within the jurisdiction" of those agencies.

In addition to our view that the testers' false statements probably will not meet the "jurisdictional" requirement of § 1001, we also believe that the statements will not satisfy the materiality requirement that nearly all courts have held to be a necessary element of the pertinent part of the statute.[16] The most common formulation of the materiality test of § 1001 and other criminal statutes that proscribe misrepresentations is as follows: the false statement must have a natural tendency to influence, or be capable of influencing, a federal department or agency to take action that it otherwise would not take.[17] If OCC notifies other relevant federal agencies about the testing program, then it would be difficult to see how the testers' false statements could influence those agencies in such a fashion, and thus difficult to see how the statements would be material.[18]

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

HMDA defines "completed application" as "an application in which the creditor has received the information that is regularly obtained in evaluating applications for the amount and type of credit requested." 12 U S.C § 2802(3) It is conceivable that a targeted bank could treat a pre-application inquiry as a "completed application" for purposes of HMDA, and submit information gleaned in the inquiry to the OCC. In such cases, the requisite § 1001 nexus between the bank and a federal agency might exist In the normal course, however, it is very unlikely that a tester's pre-application inquiry will rise to the level of an application that triggers the HMDA reporting requirements *Cf supra* note 7 (discussing meaning of "application" for purposes of Regulation B notification requirements and stating that pre-application inquiries will generally not constitute a Regulation B application) Indeed, it is our understanding that OCC has decided to use pre-application testing precisely because information about pre-application contacts between prospective borrowers and financial institutions is not a reportable event under HMDA If on the remote chance a tester is told outright at the pre-application stage that he will not qualify for any loan, OCC could notify the bank immediately and instruct the institution not to treat the tester's inquiry as an application for HMDA purposes

[16] The Second Circuit is the only court to hold otherwise. *See United States v. Bilzerian*, 926 F 2d 1285, 1299 (2d Cir.) (citing previous Second Circuit cases rejecting materiality requirement), *cert. denied*, 502 U.S 813 (1991)

[17] *See, e.g., Kungys v United States*, 485 U S 759, 770 (1988), *United States v Meuli*, 8 F 3d 1481, 1485 (10th Cir 1993), *cert. denied*, 511 U.S 1020 (1994); *United States v. Notarantonio*, 758 F 2d 777, 785 (1st Cir. 1985).

[18] Notification of United States Attorneys would make it highly unlikely that testers ever would be subjected to a federal prosecution We believe that federal prosecutors would treat the OCC testing program as a valid law enforcement operation (*see supra* note 5) and decline to prosecute testers participating in the operation, even if the testers' false statements were technically to violate any federal criminal statutes (which, in our view, they will not).